IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Marriage of | ) | No. 38752-6-III |
| | ) | |
| LAURA JO THORLEIFSON, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | UNPUBLISHED OPINION |
| v. | ) | |
| | ) | |
| ERIK HATTON THORLEIFSON, | ) | |
| | ) | |
| Respondent. | ) | |

FEARING, J. — Laura Thorleifson Fisher appeals, in part, from a parenting plan that grants joint decision-making authority between her and her ex-husband, Erik Thorleifson, and equal residential time with regard to their middle child, Jane. Fisher contends Thorleifson engaged in domestic violence, as defined in RCW 26.09.191, and the statute precludes such provisions in a parenting plan. Thorleifson fails to respond to this discrete argument of Fisher. We agree with Fisher and remand for modifications to the parenting plan.

No. 38752-6-III,
*In re Marriage of Thorleifson*

FACTS

This appeal concerns the parenting plan entered by the superior court when dissolving the marital bonds between Erik and Laura Thorleifson. Because appellant Laura Thorleifson refers to herself with the last name of "Fisher" in her brief, we refer to her as "Fisher" and her former husband as "Thorleifson." We use pseudonyms for their three children.

Laura Fisher and Erik Thorleifson married on April 10, 2002, and separated October 25, 2018. Throughout their marriage, they begat three children: Rex, Jane, and Bill. At the time of trial in 2021, Rex was 15, Jane was 14, and Bill was 12. Fisher earned a doctorate in pharmacy from Washington State University and commenced work in this profession before Rex was born. She continued to work as a pharmacist at the time of trial.

Erik Thorleifson served in the U.S. Marines beginning after graduation from college. He experienced intense combat in Iraq. As a First Lieutenant, he commanded a unit in Fallujah that suffered significant casualties during heavy fighting. Thorleifson attended law school from 2006 to 2009.

Laura Fisher testified that, at the time of Rex's birth, she took a 12-week maternity leave. On her return to work, she adopted a four ten-hour workdays per week schedule.

Erik Thorleifson testified that the couple evenly shared parenting responsibilities while he attended law school and this equal arrangement continued after Jane was born.

2

Laura Fisher disagreed. She averred that Thorleifson contributed little to Rex's care because Thorleifson spent most of his time on campus or secluded in his study at home. According to Fisher, when she worked, Thorleifson received significant assistance from her parents in caring for Rex. Rex also attended daycare. During her three days off work per week, Rex stayed home and she assumed nearly all of Rex's care. She attended to all of Rex's medical and dental needs.

During Erik Thorleifson's first year of law school, Jane was born. Fisher again took three months maternity leave. According to Fisher, thereafter, on those days that she worked, both children attended daycare. Fisher cared for the children on her days off work. She also exclusively assumed Jane's medical care.

Erik Thorleifson graduated from law school contemporaneous to the birth of the third child, Bill. After graduation, Thorleifson toiled as an associate attorney at a law firm while Laura Fisher continued to work as a pharmacist. Both parents' schedules ran chaotic, and they shared parenting equally. In 2013, Thorleifson quit his job with the law firm and gained employment with Knight Construction, where he worked until 2017. At the construction company, he worked five days per week. In 2014, the couple hired a nanny to assist in the care of the children on days when both parents worked. According to Fisher, she remained primarily responsible for medical, dental and educational care of the three children.

In 2017, Erik Thorleifson, on the agreement of the parties, left employment and stayed at home to care for the children because of the unavailability of the nanny. Laura Fisher commanded a higher salary as a pharmacist. Thorleifson started a consulting business from home. At trial, Thorleifson testified that he provided primary care for all aspects of daily care of all three children beginning in 2017. Fisher averred that at all times she remained primarily involved in the care of the children.

Laura Fisher testified to angry explosions of Erik Thorleifson. When Fisher was pregnant with Rex, Thorleifson kicked their puppy. The kick broke the dog's tail. In 2009, after the birth of all three children, she interrupted her husband while he was in bed. Thorleifson angrily grabbed Fisher's phone and threw it against the wall. The phone shattered. When the two stood in a closet, Thorleifson punched a hole in the wall by Fisher's head because of irritation towards her. He occasionally prevented her from leaving a room and sometimes forced his presence into a room where she sought solace.

Laura Fisher testified to a troublesome relationship between Erik Thorleifson and the couple's youngest child, Bill. In 2014, five-year-old Bill excitedly entered the kitchen to show his father a LEGO® set construction. Thorleifson, disturbed from being disrupted as he worked at a computer, shoved Bill to the ground and yelled in his face. When Fisher confronted Thorleifson about the anger and violence, Thorleifson denied any wrongful behavior. During trial, Fisher avowed that Thorleifson physically abused all three children.

In December 2015, according to Laura Fisher, Erik Thorleifson threatened to beat Bill with a metal shovel that Bill had leaned against the side of the shop. In March 2016, Thorleifson appeared at Laura's workplace with the children. As Jane and Rex stood behind him, Thorleifson told Fisher that he had become so angry with Bill that he thought he could not stop hitting him. Thorleifson expressed fear that he could have killed Bill. Bill had run away from his father. Thorleifson pursued him, grabbed him by the arm, and dragged him back to his vehicle. Thorleifson repeatedly hit Bill. During the workplace conversation, Thorleifson insisted that Bill was no longer part of the family and the couple needed to find a replacement to attend to Bill. During the next morning, Bill flinched when his mother hugged him goodbye. She lifted up Bill's shirt and saw multiple marks from the beating by his father.

Also, the day following the December 2015 violence, a distraught Erik Thorleifson sent Laura Fisher an email directing her to return home. Thorleifson commented about wanting to kill himself. He mentioned that he had researched information regarding the policy insuring his life. After that incident, with the additional assistance of the nanny, Fisher limited Thorleifson's time alone with the children. She also assisted Thorleifson in commencing counseling.

According to Laura Fisher, before Christmas 2016, Bill sat at the kitchen counter and would not eat vegetables. An enraged Erik Thorleifson grabbed Bill's plate and hurled it against the wall. Thorleifson grabbed Bill by the arm and drug him to his room.

On another occasion, Thorleifson locked Bill, who lacked socks and a coat, outside during a frigid winter.

Laura Fisher testified that, in June 2018, during a sailing trip with the family in the Bahamas, an angry Erik Thorleifson threw Bill, fully clothed, into the ocean. Thorleifson then instructed Fisher not to assist Bill. He then added that Fisher caused Bill's poor behavior.

On cross-examination during trial, Laura Fisher conceded that she never reported her husband's ill behavior to law enforcement or an attorney. She excused her omission because of her love for Thorleifson and because of Thorleifson having been in the military and being an attorney. She also hoped that counseling would tame Thorleifson's violence.

According to Laura Fisher, she separated from Erik Thorleifson in October 2018 after a harrowing journey from Walla Walla. Thorleifson, who drove, grew angry at Bill for crying, threatened to stop the vehicle, and menaced the child with a pledge to give him something about which to cry. Fisher sat closer to Bill in order to sooth him. While Fisher unbuckled her seat belt, Thorleifson abruptly applied the vehicle's brakes. The sudden stopping propelled Fisher into the seat in front of her. Thorleifson then drove at speeds reaching 90 miles per hour on dimly lit back roads.

In January 2019, Erik Thorleifson underwent a psychiatric assessment at the Mayo Clinic in Minnesota, where practitioners diagnosed him with post-traumatic stress

disorder (PTSD), persistent depressive disorder related to PTSD, anger, and cluster C personality traits. During his evaluation, Thorleifson acknowledged his anger toward his children and admitted to yelling, screaming, and using physical discipline. The clinic recommended intensive therapy for depression and PTSD, abstaining from alcohol, eye movement desensitization and reprocessing (EMDR) therapy, anger management, cognitive behavioral therapy, and a revision of medication. Other records showed that Thorleifson at least three times contemplated suicide.

In January 2019, psychologist Debra Brown became, with the consent of both parents, the counselor for the Thorleifson children. Eric Thorleifson subsequently withdrew his consent, but the dissolution court reinstated Dr. Brown's role.

Dr. Debra Brown saw Bill initially once a week, but more if needed. Four months before trial, Dr. Brown reduced visiting with Bill to twice per month. Bill told Dr. Brown that his father treated him differently from his brother and sister. Bill spoke of fright of his father. His father threw him in the ocean during a sailing excursion. His father hit him when angry and once locked him outside the home without sufficient clothing. Bill hid from his father at home.

Dr. Debra Brown interviewed Erik Thorleifson. Thorleifson admitted to tossing Bill into the ocean. He additionally conceded dragging Bill across the snow causing scratches. Dr. Brown testified that Thorleifson grew angry with her when she refused to

differentiate between a beating and a spanking. During talks with Thorleifson, he spoke in a raised and intimidating tone.

Dr. Debra Brown diagnosed Bill with PTSD resulting from years of abuse from his father. She also diagnosed him with depression and anxiety. Dr. Brown declared that, after the ending of reunification counseling with Jessica Kaluza, Bill felt safer. Bill's anxiety lessened.

Because of the consistency in Bill's stories, Dr. Debra Brown concluded that no one influenced Bill's comments. Dr. Brown testified that Bill's siblings confirmed Bill's allegations about his father. Rex expressed the opinion that Bill caused the problems himself. Dr. Brown did not observe Laura Fisher alienating Bill from Erik Thorleifson.

In the fall of 2020, and in order to repair Bill and his father's relationship, the trial court appointed Jessica Kaluza, a marriage and family therapist, as a reunification counselor. Kaluza ended counseling sessions in February 2021 due to insufficient progress.

Counselor Jessica Kaluza testified at trial that, during sessions, Bill shared fear of his father and shared instances that created fear. The instances included the father throwing him into the ocean, banishing him outside in the middle of winter, and repeatedly hitting him because he cried. Kaluza testified that Bill expressed fear that his father might kill him. Bill volunteered to Kaluza that he sometimes stored food because

his father occasionally withheld nourishment from him. According to Kaluza, Erik Thorleifson admitted to throwing Bill in the ocean and occasionally spanking Bill.

Jessica Kaluza unsuccessfully sought to engage Erik Thorleifson and Bill in joint sessions or in an exchange of letters. Because she was unsuccessful, Kaluza terminated the reunification counseling. In her termination letter, she quoted a comment from Bill:

> "Dad's [sic] are supposed to be the ones protecting you from dangerous things, they are not supposed to be the dangerous thing. And when they are the dangerous things [sic], there is nothing to do to protect yourself from them."

Exhibit P-34 at 1-2. Kaluza avowed that she did not observe Laura Fisher influencing Bill or speaking negatively about Thorleifson. Bill never mentioned his mother negatively influencing him about his father.

On an unidentified date, Erik Thorleifson found his Marines musical box in the trash. He supposes that Laura Fisher placed the box in the trash. According to Thorleifson, Fisher also deposited a Father's Day gift constructed by Bill into the garbage.

PROCEDURE

In October 2018, Laura Fisher filed for divorce and sought a restraining order against Erik Thorleifson. Fisher notified Thorleifson of her application for the restraining order, and Thorleifson appeared at the courthouse. According to Fisher, Thorleifson angrily confronted Fisher and warned her that, if she proceeded to divorce him, she and

the children would never see him again. The superior court entered a restraining order that precluded contact between Thorleifson and his children.

On May 16, 2019, the dissolution court appointed Nina Roecks as guardian ad litem of the children. In June 2019, the dissolution court granted Erik Thorleifson supervised visitation, which the court later expanded to unsupervised visits with Jane and Rex. In May 2020, the court entered a temporary parenting plan that allowed placement of Jane and Rex with Thorleifson on alternating weeks. During this period, no contact occurred between Bill and Thorleifson.

Trial proceeded in August 2021. At trial Laura Fisher asked the dissolution court to enter a parenting plan that allowed no contact between Bill and Erik Thorleifson until Thorleifson fulfilled the recommendations of counselor Jennifer Kaluza. Fisher also asked that the court limit placement of Rex and Jane with Thorleifson to every other weekend.

Guardian ad Litem Nina Roecks opined, at trial, that Erik Thorleifson perpetrated emotional and physical abuse on Bill. She recommended that the court limit Thorleifson's visitation with Bill under RCW 26.09.191.

In response to Laura Fisher's testimony that Erik Thorleifson punched a hole in a wall of the family residence with her present, Thorleifson testified that he punched the wall and created a hole. According to Thorleifson, Fisher was not present in the house then. He had recently retired the children to bed.

During his trial testimony, Erik Thorleifson conceded throwing his son into the ocean from a boat with the motor running because Bill then was throwing a tantrum. Thorleifson agreed he threw Bill into the water out of anger. He conceded his throwing Bill off the boat was a traumatic incident for the son.

Erik Thorleifson, during trial testimony, agreed he dragged his son across ice and snow and harmed him thereby. Thorleifson also agreed that after the dragging incident, he took the three children to Laura Fisher's place of employment, where he told her that he could have killed his son. At trial, he insisted his comment to the mother was in jest. Thorleifson disagreed that his behavior negatively impacted Ryan and claimed that Fisher manipulated his conduct to the detriment of Bill.

Erik Thorleifson averred that he drove the family car at 90 m.p.h., but attested that he did so in order to pass a vehicle on a back country road. During the trip, Bill whined. Thorleifson asked Laura Fisher to stop Bill's whining. Fisher moved from a back row seat to the middle row to sit next to Bill. Because Bill continued to whine, Thorleifson slammed on the brakes. Thorleifson did not testify to whether Fisher was buckled or how fast he drove when he slammed on the brakes.

Erik Thorleifson conceded he told counselor Brandy Henson that he struggled to control his anger and he worried his children would emulate his anger problem. At the time of trial, Thorleifson engaged in cognitive behavior therapy.

After trial, the dissolution court entered findings of fact relevant to the parties'

relationships with the children. The court subdivided one lengthy finding, finding of fact

22, into numbered paragraphs. The pertinent paragraphs read:

> 14. The wife took a secret loan of $50,000.00 from her Wal Mart
> 401(k) in violation of the temporary orders and for which she was
> previously found in contempt by this Court.
>     . . . .
> 55. Both parents were significantly involved in parenting of the
> children prior to separation.
> 56. At the time of filing, the wife obtained an ex parte restraining
> order based on allegations of abuse of the children and domestic violence
> toward her.
> 57. There is a kernel of truth to the allegations made by the wife as
> to the alleged abuse of [Bill] in that the father has emotional issues that the
> evidence shows has resulted from prior military service trauma.
> 58. The evidence presented at trial indicates that the wife's efforts to
> expand upon this kernel of truth and thus gain a leg-up in the litigation was
> an abusive use of conflict that detrimentally affected parenting and may
> cause psychological harm to the children.
> 59. The husband's testimony with regard to parenting of the
> children was more credible than the wife's.
> 60. The husband has appropriately engaged in counseling to address
> his emotional issues and this counseling should continue.
> 61. While the husband's parenting testimony was closest to the
> truth, he still may not entirely appreciate the impact of his emotional issues
> on the parenting of [Bill].
> 62. Both parents have a strong relationship with [Rex and Jane].
> 63. Reunification between [Bill] and his father is appropriate and
> must occur as soon as possible.

Clerk's Papers (CP) at 105-08. The court entered no finding of any domestic violence

perpetrated by Erik Thorleifson.

After entering the separate findings of fact, the dissolution court entered a permanent parenting plan. In the plan, the court found that Erik Thorleifson's emotional problems negatively affected his ability to parent. The court also found that Laura Fisher's abusive use of conflict was detrimental to a co-parenting relationship. The parenting plan declared that Thorleifson had not engaged in domestic violence. Therefore, the plan placed no limitations on Thorleifson under RCW 26.09.191.

The dissolution court's parenting plan declared both parents to be custodians of Rex and Jane and granted them joint decision-making authority and equal residential time regarding these two children. The plan designated Laura Fisher as the custodian of Bill. The plan mandated resumption of reunification therapy between Thorleifson and Bill. In the parenting plan, the court directed that the reunification process begin with phone contact between father and son, followed later by supervised residential time, and eventually unsupervised residential time. The plan ordered supervised time to last for two hours. The court granted temporary sole decision-making authority with regard to Bill to Fisher, subject to the father and son's reunification or further court order.

The parenting plan ordered that any disputes between Laura Fisher and Erik Thorleifson be mediated. At the time of entry of the parenting plan on January 13, 2022, Rex was age 16, Jane age 14, and Bill age 12.

13

LAW AND ANALYSIS

Laura Fisher challenges six findings of fact entered by the dissolution court and the refusal of the court to enter a finding of fact of domestic violence under RCW 26.09.191. In turn, Fisher assigns error to the trial court's refusal to impose limitations on visitation between Erik Thorleifson and Bill, the court's grant of shared residential time with Jane, the court's grant of joint decision-making authority over Jane, the court's order granting joint decision-making authority over Bill upon the father completing reunification therapy, and the court's order to engage in mediation of any disputes.

Sufficiency of Findings of Fact

Laura Thorleifson challenges paragraphs 57 through 61 and 63 in the comprehensive finding of fact 22. We proceed to determine if sufficient evidence supports each paragraph. We refer to each paragraph as if a discrete finding of fact.

In reviewing challenges to a dissolution court's findings with regard to child placement, we give broad deference to the trial court's findings. In *In re Custody of SA-M*, 17 Wn. App. 2d 939, 951, 489 P.3d 259 (2021), *cert. denied*, *Alverz v. Pinon*, 142 S. Ct. 1232, 212 L. Ed. 2d 236 (2022). An appellate court will not lightly disturb a custody ruling due to the trial court's unique opportunity to personally observe the parties. *In re Custody of Stell*, 56 Wn. App. 356, 366, 783 P.2d 615 (1989). The trial court's decision

will stand absent an abuse of discretion. *In re Marriage of McDole*, 122 Wn.2d 604, 610, 859 P.2d 1239 (1993).

We review findings of fact to determine whether they are supported by substantial evidence. *Price v. Kitsap Transit*, 125 Wn.2d 456, 465, 886 P.2d 556 (1994). Substantial evidence is evidence sufficient to persuade a fair and rational person of the truth of a premise. *Price v. Kitsap Transit*, 125 Wn.2d 456, 466 (1994). A reviewing court will not make credibility determinations on appeal. *State v. Camarillo*, 115 Wn.2d 60, 71, 794 P.2d 850 (1990). Instead, an appellate court considers the evidence in a light most favorable to the prevailing party to determine if a rational trier of fact could find the fact more likely than not to be true. *In re Welfare of X.T.*, 174 Wn. App. 733, 737, 300 P.3d 824 (2013). If substantial evidence supports a finding, contradictory evidence lacks importance. *In re Marriage of Burrill*, 113 Wn. App. 863, 868, 56 P.3d 993 (2002).

Finding of fact 57 declares:

> There is a kernel of truth to the allegations made by the wife as to the alleged abuse of [Bill] in that the father has emotional issues that the evidence shows has resulted from prior military service trauma.

CP at 107. As with all other challenged findings of fact, Laura Fisher presents no analysis in her brief as to why substantial evidence does not support this finding. In addition, the finding partially helps Fisher since we read the finding as concluding that Erik Thorleifson suffers emotional trauma attended to his military service and that Thorleifson abused Bill.

15

Laura Fisher may quibble with the wording of finding of fact 57. We question the helpfulness of the finding because of its insertion of the phrase "kernel of truth." This idiom generally means a core accuracy that contains dubious elements. The finding does not expand on what constitutes its core accuracy or any dubious elements on Fisher's allegations.

Erik Thorleifson also does not analyze whether sufficient evidence supports finding of fact 57 and does not probe the finding's inclusion of the term "kernel of truth." Because neither party analyzes the sufficiency of the evidence, we need not independently scour the record to determine the sufficiency. We will not consider a challenge to the sufficiency of evidence unsupported by argument or authority. RAP 10.3(a)(6); *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

The next challenged finding of fact reads:

> 58. The evidence presented at trial indicates that the wife's efforts to expand upon this kernel of truth and thus gain a leg-up in the litigation was an abusive use of conflict that detrimentally affected parenting and may cause psychological harm to the children.

CP at 107. In challenging this finding, Laura Fisher highlights recurring testimony that she took no action to end the marriage or limit visitation between Erik Thorleifson and the three children for many years while supporting Thorleifson in garnering professional assistance for his military trauma. Fisher adds that the guardian ad litem Nina Roecks,

16

Dr. Debra Brown, and counselor Jennifer Kaluza never found that she engaged in any acts of parental alienation. At trial, Fisher supported unsupervised contact between Thorleifson and the two older children.

In response, Erik Thorleifson mentions Laura Fisher's throwing of his Marine music box in the trash and her depositing a Father's Day gift constructed by Bill into the garbage. According to Thorleifson, Fisher employed an ex parte restraining order and her declaration supporting the order to her advantage in the dissolution proceeding.

Finding of fact 58 and related findings do not identify the specific efforts exerted by Laura Fisher to present dubious evidence of Erik Thorleifson's abuse of Bill nor identify instances when Fisher abusively took advantage of conflict. Cursory or conclusory findings of fact, even when supported by the record, are insufficient because the appeals court cannot intelligently review the trial court's decision. *In re Marriage of McCausland*, 159 Wn.2d 607, 620, 152 P.3d 1013 (2007); *In re Marriage of Horner*, 151 Wn.2d 884, 896-97, 93 P.3d 124 (2004). Therefore, we conclude that sufficient evidence does not support finding of fact 58, and we ignore the finding when reviewing the court's rulings in the parenting plan.

Finding of fact 59 declares:

> The husband's testimony with regard to parenting of the children was more credible than the wife's [testimony].

CP at 107. To repeat, a reviewing court will not make credibility determinations on appeal. *State v. Camarillo*, 115 Wn.2d 60, 71 (1990). The trial court enjoyed the advantage of viewing the witnesses testify. *In re Dependency of A.M.F.*, 23 Wn. App. 2d 135, 141, 514 P.3d 755 (2022), *aff'd,* 1 Wn.3d 407, 526 P.3d 32 (2023).

In the findings of fact, the dissolution court provided no examples of prevarications or exaggerations of Laura Fisher beyond mentioning the general subject matter of parenting. Still, when viewing the evidence in assessing the parenting plan, we will adopt the testimony of Erik Thorleifson when it conflicts with the testimony of Fisher. We will further view with caution any testimony of Fisher regarding parenting regardless of whether Thorleifson contradicted the testimony.

Finding of fact 60 reads:

> The husband has appropriately engaged in counseling to address his emotional issues and this counseling should continue.

CP at 108. We assume that Laura Fisher agrees that counseling should continue and that she only complains that Erik Thorleifson has failed to adequately engage in counseling.

In her brief, Laura Fisher faults Erik Thorleifson for failing to inform the children's guardian ad litem that he was undergoing treatment. Fisher also criticizes Thorleifson for failing to disclose any counseling records or procuring his counselor's testimony for trial. According to Fisher, the dissolution court did not know whether

18

Thorleifson complied with his counseling program. She characterizes Thorleifson's testimony about his counseling as self-serving.

We note that Laura Fisher could have demanded production of the counseling records, but she does not suggest, in her brief, that she did so. More importantly, the dissolution court may rely on self-serving testimony when entering a finding of fact. A court may solely accept the testimony of a party when finding a fact. *Fenton v. Walter*, 612 S.W.2d 17, 19 (Mo. Ct. App. 1981). We accept finding of fact 60 as is.

The next challenged finding of fact, finding 61, recites:

> While the husband's parenting testimony was closest to the truth, he still may not entirely appreciate the impact of his emotional issues on the parenting of [Bill].

CP at 108. We assume that Laura Fisher does not challenge the portion of the sentence that critiques Erik Thorleifson for underappreciating the impact of his emotional issues on the parenting of Bill. We suspect Fisher only challenges the initial clause of the finding that promotes Thorleifson as having testified the closest to the truth. We have already addressed the dissolution court's findings regarding the credibility of the parties when analyzing finding of fact 59.

The last finding of fact challenged by Laura Fisher is finding 63, which declares:

> Reunification between [Bill] and his father is appropriate and must occur as soon as possible.

19

CP at 108. We consider finding of fact 63 to be self-evidently true. Laura Fisher may worry that a quick reunification might harm Bill, but the dissolution court does not rule that reunification must occur regardless of the consequences. We read the finding to direct reunification consistent with the counseling that Bill and his father will undergo.

In her brief, Laura Fisher does not enlighten us as to any insufficiency of the evidence supporting this finding of fact 63. To repeat, we will not consider a challenge to the sufficiency of evidence unsupported by argument or authority. RAP 10.3(a)(6); *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809 (1992).

Laura Fisher also challenges language found in sections 3(a) and 3(b) in the parenting plan that she characterizes as additional findings of fact. Section 3(a) declares that neither parent engaged in domestic violence or child abuse. Section 3(b) adds that the father experiences emotional trauma that may harm the children's best interests and that the mother has abusively used conflict in the parenting relationship. Section 3(b) is redundant to findings of fact we have already discussed. We address the implied finding that Erik Thorleifson never engaged in domestic violence or child abuse in our opinion's next section.

Omission of .191 Finding of Fact

We move to the heart of Laura Fisher's appeal. Fisher assigns error to the dissolution court's failure to enter a finding under RCW 26.09.191(1). In turn, because of the lack of such a finding, Fisher complains that the court failed to limit Erik

20

Thorleifson's time with Jane and failed to impose limits on Thorleifson's decision-making for all children. Thorleifson devotes his appeal brief to analyzing the criteria for a parenting plan under RCW 26.09.187. He provides no argument to defeat Laura Fisher's request to direct entry of a finding under RCW 26.09.191(1) or the consequences of such a finding.

RCW 26.09.191(1) and (2) respectively limit the trial court's authority to establish a parenting plan with joint decision-making and equal residential time if a parent has a history of domestic violence, as defined under RCW 7.105.010. The statutory subsections read:

> (1) The permanent parenting plan *shall not* require mutual decision-making or designation of a dispute resolution process other than court action if it is found that a parent has engaged in any of the following conduct: (a) Willful abandonment that continues for an extended period of time or substantial refusal to perform parenting functions; (b) *physical*, sexual, or a *pattern of emotional abuse of a child*; or (c) a *history of acts of domestic violence as defined in RCW 7.105.010* or an assault or sexual assault that causes grievous bodily harm or the fear of such harm or that results in a pregnancy.
> (2)(a) The parent's residential time with the child *shall be limited* if it is found that the parent has engaged in any of the following conduct: (i) willful abandonment that continues for an extended period of time or substantial refusal to perform parenting functions; (ii) *physical,* sexual, or a *pattern of emotional abuse* of *a* child; (iii) a *history of acts of domestic violence as defined in RCW 7.105.010. . . .*
> . . . .
> (m)(i) The limitations imposed by the court under (a) or (b) of this subsection shall be reasonably calculated to protect the child from the physical, sexual, or emotional abuse or harm that could result if the child has contact with the parent requesting residential time. . . . The limitations the court may impose include, but are not limited to: Supervised contact

between the child and the parent or completion of relevant counseling or treatment. If the court expressly finds based on the evidence that limitations on the residential time with the child will not adequately protect the child from the harm or abuse that could result if the child has contact with the parent requesting residential time, the court shall restrain the parent requesting residential time from all contact with the child.

RCW 26.09.191(1) and (2)(a), (m)(i) (emphasis added). Laura Fisher relies on RCW 26.09.191(1) subsections (b) and (c) in precluding limitations on joint decision-making and RCW 26.09.191(2)(a) subsections (ii) and (iii) when seeking limitations on Erik Thorleifson's residential time with Jane.

At the time of trial, RCW 26.09.191(1) referenced the definition of "domestic violence" quoted in the former RCW 26.50.010(3). The legislature repealed RCW 26.50.010 in favor of RCW 7.105.010, with an effective date of July 1, 2022. In turn, the legislature amended RCW 26.09.191(2)(a) to reference the definition of "domestic violence" found in RCW 7.105.010. Neither party suggests that the outcome of this appeal changes depending on whether we employ the former RCW 26.50.010(3) or the current RCW 7.105.010. We therefore utilize the latter statue.

RCW 7.105.010 defines "domestic violence" as:

> (9) "Domestic violence" means:
> (a) *Physical harm*, bodily injury, *assault*, or *the infliction of fear of physical harm*, bodily injury, or assault; nonconsensual sexual conduct or nonconsensual sexual penetration; *coercive control*; unlawful harassment; or stalking of one intimate partner by another intimate partner; or
> (b) Physical harm, bodily injury, assault, or the infliction of fear of physical harm, bodily injury, or assault; nonconsensual sexual conduct or nonconsensual sexual penetration; coercive control; unlawful harassment;

or stalking *of one family or household member* by another family or household member.

(Emphasis added.) RCW 7.105.010(9) expansively defines "domestic violence" as including "coercive control." In turn, RCW 7.105.010(4) both defines "coercive control" and lists a nonexhaustive catalogue of actions forming "coercive control." Subsection 4 declares:

> (4)(a) "Coercive control" means a pattern of behavior that is used to cause another to suffer physical, emotional, or psychological harm, and in purpose or effect unreasonably interferes with a person's free will and personal liberty. In determining whether the interference is unreasonable, the court shall consider the context and impact of the pattern of behavior from the perspective of a similarly situated person. Examples of coercive control include, but are not limited to, engaging in any of the following:
> (i) *Intimidation* or controlling or compelling conduct *by*:
> . . . .
> (C) *Carrying, exhibiting, displaying*, drawing, or threatening to use, *any firearm* or any other weapon apparently capable of producing bodily harm, in a manner, under circumstances, and at a time and place that either manifests an intent to intimidate the other party or that warrants alarm by the other party for their safety or the safety of other persons;
> (D) *Driving recklessly with the other party or minor children in the vehicle;*
> (E) Communicating, directly or indirectly, the intent to:
> (I) *Harm the other party's children*, family members, friends, or pets, including by use of physical forms of violence;
> . . . .
> (III) *Attempt suicide* or other acts of self-harm; or
> . . . .
> (vi) Engaging in psychological aggression, including inflicting fear, humiliating, degrading, or punishing the other party.

(Emphasis added.)

Under RCW 26.09.191(1), a finding of a history of domestic violence mandates sole decision-making in a parenting plan. *In re Parenting & Support of C.A.S.*, 25 Wn. App. 2d 21, 28-29, 522 P.3d 75 (2022); *In re Parenting & Support of L.H.*, 198 Wn. App. 190, 194, 391 P.3d 490 (2016). Stated differently, RCW 26.09.191(1)(c) constrains the discretion of the trial court in determining parental decision-making. *In re Marriage of Caven*, 136 Wn.2d 800, 808, 966 P.2d 1247 (1998). By inserting the word "shall" in RCW 26.09.191(1), the legislature created a duty for the trial court rather than conferring discretion. *In re Parenting & Support of C.A.S.*, 25 Wn. App. 2d 21, 27 (2022).

*In re Parenting & Support of L.H.*, *In re Parenting & Support of C.A.S.*, *In re Marriage of Mishko & Kehr*, 23 Wn. App. 2d 571, 519 P.3d 240 (2022), and *In re Marriage of Caven*, the trial court granted one party joint decision-making authority despite that party engaging in domestic violence. The reviewing court reversed and remanded for revision of the parenting plan.

In *In re Parenting & Support of C.A.S.*, the mother engaged in abusive use of conflict. The trial court granted the father joint decision-making powers in part because of the use of conflict. This court reversed the dissolution court despite the mother's use of conflict.

In *In re Marriage of Mishko & Kehr*, the dissolution court declined to enter a finding of domestic violence despite undisputed evidence supporting the violence. This

24

court remanded for the court to reconsider its ruling granting joint decision-making for both parents.

Laura Fisher contends that Erik Thorleifson engaged in physical and emotional abuse of a child and committed a series of domestic violence acts as defined in RCW 7.105.010. She compiles a lengthy inventory of facts that could constitute one or more incidents of physical abuse of a child, emotional abuse of a child, or domestic violence. The list includes communicating the intent to commit suicide, abusing a dog while she was pregnant with Rex, seizing her phone and shattering it against the wall when he became angry, punching a hole in the wall next to her head, preventing her from leaving rooms, forcing his way into rooms in which she had locked herself, shoving Bill to the ground and yelling in his face when Bill interrupted him while working, threatening to beat Bill with a metal shovel, beating Bill repeatedly and dragging him across the ground while leaving visible marks, throwing a plate of food against the wall, grabbing Bill by his arm and dragging him to his room, locking Bill outside in the cold with no socks or coat, throwing Bill from a boat into the ocean out of anger, driving recklessly with her and the children in the car, slamming the brakes of the vehicle when she was unbuckled, confronting her outside the courthouse when she filed for a divorce, and telling her that, if she filed for divorce, she and the children would never see him again.

Medical records show Erik Thorleifson encounters difficulty in managing anger. A Mayo Clinic evaluation reports that Thorleifson acknowledged anger toward his children and his yelling, screaming, and using physical discipline.

Counselors testified at trial regarding physical and emotional harm to the youngest child, Bill. Bill expressed fear of his father to the counselors and listed occasions of his father's use of force. The counselors' testimony confirmed many of the stories relayed by Laura Fisher during her trial testimony. Counselors added that Erik Thorleifson admitted to some of the alleged conduct such as tossing Bill into the ocean and dragging Bill across the snow causing scratches.

Guardian ad litem Nina Roecks averred that Erik Thorleifson admitted to frequent anger and difficulty with managing his emotions. Thorleifson directly admitted to telling Laura Fisher that he was so mad that he could have killed Bill and that he told Bill that he would not be a member of the family if his behavior continued. He admitted to driving at speeds up to 90 m.p.h. with his wife and the children in the vehicle. He admitted he slammed the brakes, which caused Fisher to hit the seat in front of her. He further admitted to three occasions of suicidal ideation, including one at the time of the parties' separation.

Guardian ad litem Nina Roecks testified that Erik Thorleifson blamed others for his actions. Thorleifson accused Laura Fisher of alienating the children from him.

Roecks recommended that the trial court enter a finding that Thorleifson had engaged in physical and emotional abuse of Bill.

We encounter obstacles in analyzing the list of events presented by Laura Fisher because the dissolution court did not enter any finding of fact confirming that any of the events occurred. Generally, the absence of a finding on a material issue is presumptively a negative finding entered against the party with the burden of proof. *State v. Budd*, 186 Wn. App. 184, 199, 347 P.3d 49 (2015), *aff'd*, 185 Wn.2d 566, 374 P.3d 137 (2016). Also, the trial court determined Fisher to lack credibility at least as to the subject area of parenting.

We are also uncertain as to whether we should rely on reports given by Bill or even Erik Thorleifson to the counselors and to guardian ad litem Nina Roecks. The dissolution court did not question the credibility of any of the professionals or the guardian. The guardian ad litem plays a special role in advising the court such that the court should respect the guardian's input. But the court did not adopt any of these witnesses' testimony as findings of fact.

Despite these impediments, we hold that the dissolution court erred when failing to enter a finding under RCW 26.09.191(1) that Erik Thorleifson engaged in abusive behavior. In doing so, we rely exclusively on Thorleifson's trial testimony regarding his behavior. Under his concessions, the undisputed evidence established the behavior interdicted in RCW 26.09.191(1).

Erik Thorleifson conceded driving on back roads at speeds of 90 m.p.h. with the entire family in the car. Passing a car does not justify this speed on a back road. Thorleifson agreed that he grew angry with Bill's whining and directed Laura Fisher, to end the whining. When the whining did not cease and while Fisher was moving seats, he slammed on the car brakes. RCW 7.105.010(4) includes driving recklessly with family members in the car as a means of "coercive control."

Erik Thorleifson threw Bill into the ocean from a boat. Although Thorleifson considers this conduct to be appropriate discipline, he also conceded that the event would cause Bill trauma. Thorleifson dragged Bill over snow and caused physical injury to the son. Thorleifson, with Bill in the vicinity, told Laura Fisher that he could have killed Bill. Thorleifson conceded punching a hole in the wall out of anger. He disputes that Fisher was present in the home, but the children were present at the time. The Washington Supreme Court, in *Rodriguez v. Zavala*, 188 Wn.2d 586, 598, 398 P.3d 1071 (2017), reasoned that direct and indirect exposure of a child to violence in the home harms the child and constitutes domestic violence under Washington law. Thorleifson mentioned the possibility of committing suicide—another action categorized as "coercive control."

The dissolution court found a "kernel of truth" to the factual assertions of Laura Fisher as to abuse of Bill resulting from Erik Thorleifson's emotional issues stemming from military service trauma. Even a kernel of truth means some abuse occurred.

Because of the undisputed evidence, we remand to the superior court to enter a finding of domestic violence under RCW 26.09.191(2). In turn, the court should deny Erik Thorleifson decision-making authority for Bill. The court should also strike any direction to engage in mediation at the time of a dispute.

Laura Fisher also requests that this court direct the superior court to remove from Erik Thorleifson joint decision-making powers with regard to Rex and Jane and to limit Thorleifson's residential time with Jane. We note that Rex is now eighteen so any parenting plan provision with regard to Rex is moot.

Guardian ad litem Nina Roecks testified that Erik Thorleifson conceded striking all children. Nevertheless, we need not rely on this testimony to limit Thorleifson's decision-making powers or residential time with Jane. RCW 26.09.191(1) limits the trial court's authority to establish a parenting plan with joint decision-making if a parent has a history of physical or a pattern of emotional abuse of "a child" or a history of acts of domestic violence. Laura Fisher does not seek to restrict the .191 limitations to only Bill.

Jane was herself the victim of domestic violence. Jane was present in the car when her father drove recklessly in back roads, became angry, and slammed on the car brakes. She was present in the home when her father punched a hole in the wall.

In addition to Jane being impacted by domestic violence and coercive control, a dissolution court, under the language of RCW 26.09.191, must limit a parent's contact and decision-making authority with regard to one child when that parent abuses or

29

engages in violence with another child. In other words, the violence or abuse toward one child impacts the residential time and decision-making authority towards another child. Both RCW 26.09.191(1) and RCW 26.09.191(2) reference physical abuse or a pattern of emotional abuse of "a child." The subsections employ the article "a." The statutory subsections do not limit their breadth to physical or emotion abuse of "the child" in question.

A court should not overlook or discount the articles in a statutory text—the definite articles and the indefinite articles—but should treat those articles as chosen by design and as intending a particularizing effect. *In re A.P.*, 245 W. Va. 248, 858 S.E.2d 873, 879 (2021). Whereas definite articles like "the" restrict the noun that follows as particularized in scope or previously specified by context, the indefinite "a" has generalizing force. *Nielsen v. Preap*, 586 U.S. 392, 408, 139 S. Ct. 954, 203 L. Ed. 2d 333 (2019).

In sum, we remand to the dissolution court to enter a finding of physical and emotional abuse and domestic violence under RCW 26.09.191. In turn, the court should strike the provisions of equal residential time and joint-decision authority for Erik Thorleifson with regard to daughter Jane. The court should enter restrictions on residential time consistent with RCW 26.09.191(2)(m)(i). Finally, the dissolution court should strike the parenting plan provision that requires mediation.

30

No. 38752-6-III,
*In re Marriage of Thorleifson*


Attorney Fees

Erik Thorleifson requests an award of reasonable attorney fees and costs incurred on appeal pursuant to RCW 26.09.140. The statute authorizes the court to award one party fees against the other party based on financial circumstances. Nevertheless, Thorleifson has failed to file an affidavit of financial need as required by RAP 18.1(c). Therefore, we deny his request.

CONCLUSION

We remand to the superior court to modify its findings of fact and parenting plan consistent with our opinion.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Fearing, J.

WE CONCUR:

_____
Staab, A.C.J.

_____
Cooney, J.


31